

14 CV 8122

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GABINO GENAO,

                     Plaintiff,

- against -

CITY OF NEW YORK; Former Commissioner DORA B. SCHRIRO; Former Chief of Department MICHAEL HOURIHANE; Former Deputy Commissioner FLORENCE L. FINKLE; Former Deputy Chief of Department CARMINE LABRUZZO; Former Assistant Chief of Security ELISEO PEREZ; Warden ROSE AGRO; Captain MOISES SIMANCAS, Shield #428; Correction Officer APRIL JACKSON, Shield #10348; and Correction Officer TYRONE WINT, Shield #48467,

                     Defendants.

No. 14 Civ.

**COMPLAINT AND JURY TRIAL DEMAND**

---

### PRELIMINARY STATEMENT

1. This action, brought by Plaintiff Gabino Genao pursuant to 42 U.S.C. § 1983, arises from an extraordinary case of brutality, excessive force, and serious injury on Rikers Island. The misconduct here was so extreme that the officers involved have been indicted by the Bronx District Attorney's Office on criminal charges related to their participation in the beating of Mr. Genao and their subsequent cover-up of the incident.

2. On or about October 30, 2012 while Mr. Genao was in the custody of the New York City Department of Correction ("DOC" or the "Department") at the George R. Vierno Center on Rikers Island ("GRVC"), he was brutally beaten by DOC staff members. Correction officers viciously and repeatedly punched, kicked, stomped on, and beat Mr. Genao about the head and body, including with a baton. The attack was so ferocious that Mr. Genao was knocked

unconscious. Incredibly, the assault took place while Mr. Genao was handcuffed with his hands behind his back, completely defenseless.

3. The Department and its supervisors are, and have been, aware that Department staff members persistently use excessive force and cause prisoners serious injuries, and they have consistently failed to take meaningful and effective steps to curb staff brutality. The incident involving Mr. Genao is part of a pattern of incidents where Department officers use excessive and injurious force to command, control, discipline and/or punish inmates.

4. Mr. Genao now seeks redress against the Department employees who beat him, their supervisors, and the City of New York.

## JURISDICTION AND VENUE

5. This action arises under the Fourteenth Amendment to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

6. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367(a).

7. The acts complained of occurred in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

8. Plaintiff demands trial by jury in this action.

## PARTIES

9. Plaintiff Gabino Genao is a citizen of the United States and a resident of New York. At the time DOC staff assaulted him, on or about October 30, 2012, Mr. Genao was incarcerated at the GRVC on Rikers Island in East Elmhurst, New York.

10. Defendant City of New York ("City") is a municipal corporation that, through the DOC, operates a number of detention facilities. The Department, through its senior officials at the central office, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the use, reporting, and investigation of force by uniformed staff. In addition, senior officials in the Department are aware of and tolerate practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten Department policies or customs. The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein.

11. At all times relevant hereto, Defendant Dora B. Schriro was the Commissioner of DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law. On information and belief, Defendant Schriro, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the training, supervision, and conduct of all DOC personnel, including the Defendants referenced herein. As Commissioner, Defendant Schriro was also responsible for the care, custody, and control of all inmates housed in the Department's jails. As Commissioner, Schriro was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in the Department jails. In addition, at all relevant times, Defendant Schriro was responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York. Defendant Schriro is sued in her individual capacity.

12. At all times relevant hereto, Defendant Hourihane was the Chief of Department DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law. As Chief of Department, he was the highest ranking uniformed member of the Department, and was responsible for the supervision, oversight, and discipline of the uniformed security staff in all the Department jails. He was also responsible for the care, custody, and control of all inmates in the Department jails. As Chief of Department, Hourihane was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Hourihane is sued in his individual capacity.

13. At all times relevant hereto, Defendant Florence Finkle was the Deputy Commissioner of the Department's Investigation Division. As Deputy Commissioner, her responsibilities included supervising the investigation of any and all incidents in which any employee of the Department used force against any inmate, or was alleged to have used force, and recommending Department discipline against staff believed to have violated Department policies and rules, including those concerning use of force. Defendant Finkle was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other breaches of security in Department jails. Defendant Finkle is sued in her individual capacity.

14. At all times relevant hereto, Defendant Carmine LaBruzzo was the Deputy Chief of Department for the DOC. As Deputy Chief of Department, his responsibilities included supervision and oversight of the Department's uniformed personnel with respect to operational issues in Department jails pertaining to the safety and security of inmates and staff. These responsibilities included the tracking of violent incidents and the formulation of responses designed to protect the personal safety of Department staff and inmates in DOC custody. As

Deputy Chief of Department, Defendant LaBruzzo was provided on a daily basis with reports of applications of force, allegations of unreported used of force, and other violent incidents in DOC jails.  Prior to the incident involving Mr. Genao, and over an extended period of time, Defendant LaBruzzo engaged in, encouraged, and tolerated the misuse of force in Department facilities where he worked.  As a Captain in the Central Punitive Segregation Unit ("CPSU"), Labruzzo was charged at least five times with violating the Department's use-of-force policy in incidents in which he was involved.  Subsequently, when promoted to Warden of the GRVC, LaBruzzo supervised staff in a facility in which significant numbers of inmates were seriously injured in use-of-force incidents, and took no meaningful steps to address or remediate the pervasive problem.  In his role as Warden, Defendant LaBruzzo was sued on several occasions for being aware of yet failing to stop ongoing incidents of excessive and unjustified force by correctional officers.  Defendant LaBruzzo is sued in his individual capacity.

15. At all times relevant hereto, Defendant Eliseo Perez was the Assistant Chief of Security for DOC.  As Assistant Chief of Security, Defendant Perez was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other incidents involving any use of force in any Department jail.  In 2013, Defendant Perez was arraigned on criminal charges in connection with the beating of an inmate by guards, which DOC officials conspired to cover up.  Defendant Perez allegedly ordered subordinates to kick in the inmate's teeth.  That criminal case remains pending.  Defendant Perez is sued in his individual capacity.

16. At all times relevant hereto, Defendant Rose Agro was the Warden of the GRVC within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  As

Warden, his responsibilities included the care, custody, and control of all inmates, as well as the supervision of all staff, in the GRVC.  Defendant Clemons is sued in his individual capacity.

17.     Defendants Schriro, Hourihane, Finkle, LaBruzzo, Perez, and Agro are collectively referred to as the "Supervisory Defendants" herein.

18.     At all times relevant hereto, Defendant Moises Simancas, Shield #428, was a captain with the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Defendant Simancas worked at the GRVC at the time of the incidents alleged herein.  Captain Simancas's responsibilities included the care, custody, and control of inmates and officers under his supervision.  He participated in and/or witnessed and failed to intervene in the beating of Mr. Genao that took place on October 30, 2012.  Captain Simancas is sued in his individual capacity.

19.     At all times relevant hereto, Defendant April Jackson, Shield # 10348, was a correction officer within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of her employment as such, and acting under color of state law.  Defendant Jackson worked at the GRVC at the time of the incidents alleged herein, and participated in and/or witnessed and failed to intervene in the beating of Mr. Genao that took place on October 30, 2012.  Defendant Jackson is sued in her individual capacity.

20.     At all times relevant hereto, Defendant Tyrone Wint, Shield #48467, was a correction officer within the DOC, acting in the capacity of agent, servant, and employee of Defendant City, within the scope of his employment as such, and acting under color of state law.  Defendant Wint worked at the RNDC at the time of the incidents alleged herein, and participated in and/or witnessed and failed to intervene in the beating of Mr. Genao that took place on October 30, 2012.  Defendant Wint is sued in his individual capacity.

## STATEMENT OF FACTS

**New York City's Jails: A Long History of Systemic Abuse**

21. For decades, through Department reports and civil litigation, DOC has been aware of the routine, dangerous, and unconstitutional use of excessive force by staff throughout the DOC.[1]

22. For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 450 (S.D.N.Y. 2002) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit. That litigation unearthed evidence of abuse of prisoners and cover-ups of that abuse that was sufficiently serious to merit criminal prosecutions of DOC staff members and the entry of a comprehensive, detailed consent decree imposing substantial obligations on the Department to address the systemic causes of the staff brutality.

23. *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the widespread practice of using excessive force against inmates incarcerated in the City jails. This litigation revealed significant numbers of credible excessive force complaints from prisoners who had been seriously injured by staff in the City jails. The settlement of this class action was intended to provide meaningful improvements in the training, practice, and supervision of agency staff and

---

[1] *See, e.g., Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988) (Correctional Institution for Men), *injunction entered*, 718 F. Supp. 1111 (S.D.N.Y. 1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990); *Jackson v. Montemagno*, No. 85 Civ. 2384 (E.D.N.Y.) (Brooklyn House of Detention); *Reynolds v. Ward*, No. 81 Civ. 101 (S.D.N.Y.) (Bellevue Prison Psychiatric Ward); *Sheppard v. Phoenix*, No. 91 Civ. 4148 (S.D.N.Y.) (CPSU).

investigators and changes in the Department's use-of-force policy. However, use of excessive force by correction officers against inmates remains pervasive.

24. In 2011, the City was named as a defendant in *Nunez v. City of New York*, No. 11 Civ. 5845 (S.D.N.Y.), a class action lawsuit that alleges widespread use of excessive force by correction officers at Rikers island. The operative complaint in that suit, which was filed less than two months before Mr. Genao's beating, once again placed the City on notice that "officers and captains" at Rikers "have inflicted brutal beatings on . . . inmates" and "have lied and coerced false statements to prevent the beatings from coming to light," while supervisors have created and perpetuated "a policy of permitting uniformed staff to use unlawful, excessive force with impunity." Second Amended Complaint, *Nunez v. City of N.Y.*, No. 11 Civ. 5845 (S.D.N.Y. Sept. 4, 2012), ECF No. 34 ¶ 1.

25. The United States Attorney's Office for the Southern District of New York has investigated the problem of excessive force by Department staff on Rikers Island, as have the New York City Department of Health and Mental Hygiene, the New York City Department of Investigation, the Bronx District Attorney's Office, and the *New York Times*. Mark G. Peters, Commissioner of the Department of Investigation, called the beating of Mr. Genao part of "a pattern of lawless conduct at Rikers that must be brought under control." The *New York Times* reported recently, after a months-long investigation of Rikers, that "brutal attacks by correction officers on inmates" are "common occurrences" at Rikers and observed that "a dearth of whistle-blowers" as well as "reluctance of the city's Department of Correction to acknowledge the problem and the fact that guards are rarely punished" contribute to what the *Times* called a "culture of brutality on the island."

26. On August 4, 2014, the United States Attorney for the Southern District of New York released a report that documented conclusions reached after a two-year investigation of conditions at Rikers Island pursuant to the federal Civil Rights of Institutionalized Persons Act. The U.S. Attorney concluded that a "culture of violence" pervades the jails, and that officers use excessive force and injure prisoners at a staggering rate, all within a system that fosters and guarantees impunity. While the report focused on the adolescent population at Rikers, the federal authorities noted: "our investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers."

27. Also in August 2014, the Office of the New York City Comptroller issued a report concerning injury claims filed against DOC and settlement and judgments issued against DOC in fiscal year 2014. The report demonstrated the City's awareness of the widespread use of injurious force in City jails. For example, the report showed that personal injury claims against the City for injuries occurred at correction facilities have climbed steadily in recent years. According to the Comptrollers' office, 2,245 such claims were filed against DOC in fiscal year 2014, an increase of 37% over fiscal year 2013 and a 114% increase since fiscal year 2009, when just over 1,000 such claims were filed. The report also showed that personal injury claims involving incidents at GRVC have risen steadily in recent years, from just over 100 in fiscal year 2009 to nearly 250 in fiscal year 2014.

28. DOC's own Commissioner, Joseph Ponte, testified before the New York City Council on June 2, 2014. He admitted that the Department "is in deep trouble," and stated that DOC's "past performance has been unacceptable." As support for this conclusion, Mr. Ponte cited statistics on increasing violence in the City's jails dating back to 2010—well before the beating of Mr. Genao.

29. On information and belief, the number of incidents in which use of force has resulted in class A injury (an injury requiring medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid) to staff and/or inmates has steadily increased over the last several years. In 2008, there were 88 such incidents reported, followed by 109 incidents in 2009, 128 incidents in 2010, 142 incidents in 2011, and 147 incidents in 2012.

30. Cover-ups are also a part of DOC culture. For example, according to the *New York Times*, DOC's own investigators produced a report in 2012, which concluded that Department staff, including the warden and deputy warden of the Robert N. Davoren Complex at Rikers Island ("RNDC"), had participated or been complicit in the intentional falsification of statistics in order to create the false appearance that violence in the jail was declining. The report originally stated that "no legitimate explanation exists for the dramatic and inaccurate decreases in the number of inmate fights," and recommended that RNDC's warden and deputy warden be demoted because they "abdicated responsibility" and "failed to supervise, manage, or oversee the facility's reporting of violence statistics." Instead of demoting them, however, Defendant Schriro ordered that the report be sanitized of any mention of their wrongdoing. The United States Attorney's Office, which was in the midst of investigating violence at the jail, received only the doctored report. When the cover-up was unearthed, the United States Attorney reacted in a statement noting that such a cavalier attitude toward the truth "does not instill confidence in us that the City will quickly meet its constitutional obligations."

31. The GRVC in particular is a site of intense and unchecked guard-on-inmate violence. The City has been on notice of this fact for years and has failed to take adequate or appropriate steps to remedy the situation. For instance, the City has been sued

repeatedly for violating GRVC inmates' constitutional right to be free from the use of excessive force.  *See, e.g.*, *Joseph v. N.Y.C.D.O.C.*, No. 02 Civ. 9219 (S.D.N.Y.) (plaintiff beaten at GRVC, resulting in an orbital fracture; case settled for $375,000); *Rice v. N.Y.C.D.O.C.*, No. 03 582 (S.D.N.Y.) (two plaintiffs beaten at GRVC suffered a collapsed lung and spinal injuries, respectively; cases settled for $255,000 and $590,000 respectively); *Youngblood v. City of N.Y.*, No. 08 Civ. 5982 (S.D.N.Y.) (GRVC officers brutally beat plaintiff in the head and body with fists and blunt objects, causing a broken nose, head trauma, and other injuries; case settled for $240,000); *Pauling v. City of N.Y.*, No. 09 Civ. 2617 (S.D.N.Y.) (GRVC officers stomped on plaintiff's head after positioning his head directly over a solid metal bedframe; plaintiff accepted City's offer of judgment in the amount of $75,001 plus attorneys' fees).

32. Through DOC's internal reporting system, the City and the Supervisory Defendants were and are aware of the pattern of a large number of incidents involving the use of unnecessary and/or excessive force to injure rather than to restrain inmates, and have failed to take sufficient steps to stop these instances of excessive force from continuing to occur.

33. The City and the Supervisory Defendants are also aware of the failures of DOC's Investigation Division to adequately investigate allegations of misconduct, a practice that causes further abuse.

34. The City and the Supervisory Defendants have not taken sufficient steps to curb the abuse that occurs on a frequent basis in the City jails.  The City and the Supervisory Defendants are aware of the failure of the Department to bring effective disciplinary charges against its officers who use unnecessary and excessive force on prisoners and/or who fail to accurately and honestly report it, which perpetuates the practice of unnecessary and excessive force by correction officers against inmates.

35. The City and the Supervisory Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in the City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

**The Assault on Gabino Genao on October 30, 2012**

36. In the days leading up to October 30, 2012, while he was incarcerated at the GRVC, Gabino Genao learned that Hurricane Sandy was approaching the New York area.

37. Shortly before the storm began, Mr. Genao learned that the approximately 1,350 inmates in the GRVC would be "locked in" during the storm, unable to leave their cells.

38. As the storm approached, tensions at the GRVC were running high; inmates including Mr. Genao asked staff what would happen if the GRVC lost power or began to flood, but their inquiries were largely ignored.

39. In the late afternoon or early evening on October 28, 2012, Mr. Genao and other GRVC inmates were locked in their cells. They remained locked in for approximately 30 hours, until the morning of October 30, 2012.

40. Hurricane Sandy made landfall in the early evening hours on October 29, 2012. By then, the President and the Governor had both declared states of emergency, and the Mayor had ordered thousands of people to evacuate. The storm ground public transportation and services throughout the City to a halt. It flooded streets, tunnels, and buildings, causing billions of dollars in damage and dozens of deaths. Emergency calls to 911 numbered approximately 10,000 per half hour. Homes and businesses were destroyed, and electricity and other crucial services were disrupted for days or weeks.

41. Locked in a cell as this chaos and destruction unfolded, Mr. Genao was terrified. Water began to flow into his cell. Like many other inmates at the GRVC, Mr. Genao expressed his fear and frustration verbally, including with obscenities that were audible to staff.

42. When Mr. Genao was finally released from his cell on October 30, 2012, he called his family to let them know he was unharmed and to learn how they had fared in the storm. He then learned that Defendant Jackson had begun to tell other inmates that she was "mad" about an insult she had heard an inmate yell during the storm and was demanding to know who had made the offending statement, lest she "take it out on everyone."

43. Mr. Genao recognized the statement as one he had possibly made. On his own initiative, he approached Defendant Jackson and admitted as much.

44. Defendant Jackson was incensed. She screamed at Mr. Genao, unleashing a stream of profanity-laced vitriol.

45. Defendant Jackson yelled for Mr. Genao to pack up his cell, and told him that he was "leaving" because she was "sick of" him.

46. As Mr. Genao was packing, Defendants Simancas and Wint entered his cell. Defendant Simancas handcuffed Mr. Genao behind his back using his black Captain's handcuffs, and the two officers began to pull Mr. Genao out of his cell. Mr. Genao knew all too well what was about to happen. He begged other inmates who were nearby to call his family and alert them.

47. Defendantas Simancas and Wint brought Mr. Genao to a vestibule just outside his housing area, where they were joined by Defendant Jackson. Defendant Simancas instructed Defendant Jackson to hit Mr. Genao, who was still handcuffed behind his back. She attempted to do so, but she missed when Mr. Genao ducked out of the way. Defendant Wint,

who at 6'8" tall vastly outmtaches Mr. Genao in physical size, then yanked Mr. Genao's handcuffs, throwing him to the ground by his neck.  Mr. Genao hit the floor face first.

48. The three officers (collectively the "Individual Defendants") began to punch, kick, and stomp on Mr. Genao's head, neck, and torso.  They concentrated particular attention on his ankle, where all of the Individual Defendants knew that Mr. Genao had sustained a recent injury and from which he had had a cast removed only a month prior.  Upon information and belief, the Individual Defendants did this because they knew it would cause Mr. Genao particularly excruciating pain.

49. Defendant Wint threw himself on top of Mr. Genao to hold him down.  Mr. Genao struggled to free himself, but was unable to do so.

50. Mr. Genao suffered a laceration between his earlobe and face that later had to be repaired with sutures.

51. Defendant Simancas then sprayed Mr. Genao, who was still handcuffed behind his back, with oleoresin capsicum pepper spray directly in the face.

52. Defendant Simancas held the spray approximately one inch from Mr. Genao's face.

53. As the spray filled his eyes, mouth, and lungs, Mr. Genao, who is asthmatic, became convinced that he was about to die.

54. Next, Defendant Simancas told Defendant Jackson to leave.  She did so, but then quickly returned.  Upon information and belief, she returned with a baton.

55. Defendant Simancas proceeded to strike Mr. Genao with the baton at least 15 times.  Mr. Genao screamed in pain and fear, but the beating continued.  Finally, a particularly acute blow to Mr. Genao's head knocked him unconscious.

56. At no time prior to or during the assault did Mr. Genao make any aggressive gestures toward anyone.

57. At no time did Mr. Genao attempt to strike his attackers.

58. Throughout the assault, the Individual Defendants shouted for Mr. Genao, who was not resisting, to "stop resisting."  Upon information and belief, "stop resisting" is a common refrain that officers at Rikers yell while beating prisoners in a haphazard attempt to create the misimpression that their use of force is justified.

59. Mr. Genao woke up in the intake area of the jail.  He did not remember how he got there.  Someone threw water on his face to wake him.

60. After approximately 15 minutes in the intake area, Mr. Genao was taken to the jail's medical clinic.  A doctor who examined him told Mr. Genao, in sum and substance, "they almost killed you."

61. Mr. Genao vomited repeatedly.  His blood was everywhere.

62. An ambulance arrived at the jail and transported Mr. Genao to Elmhurst Hospital, where he was treated in the Emergency Room.

63. Mr. Genao suffered excruciatingly painful injuries to his arms, shoulders, back, and left ankle.  He continues to suffer from back pain every day.  He also suffers from extremely severe headaches that are the result of the brain injury that the Individual Defendants inflicted upon him.  He has nightmares and finds that he can no longer be the active person he once was.

64. Mr. Genao could not urinate or move his bowels for several days after the attack.

65. After the beating, the Individual Defendants intentionally submitted inaccurate official reports to cover up their misconduct. They falsified their account of the beating, providing explanations that were at odds with the reality of the assault and inconsistent with Mr. Genao's injuries.

66. Perhaps most crucially, the Individual Defendants completely omitted from their reports any mention of using a baton. However, contusions on Mr. Genao's body were consistent with the imprint of a standard-issue DOC baton.

67. As a result of their misconduct, Defendants Simancas, Jackson, and Wint were indicted by the Bronx District Attorney's Office. Each has been removed from contact with inmates, and all are currently free on bail awaiting trial for attempted first-degree assault, falsifying business records, and other criminal charges.

68. Based on the Individual Defendants' false reports, Mr. Genao was sent to solitary confinement as punishment for being beaten unconscious with his hands cuffed behind his back. He spent approximately three or four days in punitive segregation.

69. The City and the Supervisory Defendants were aware of or should have been aware of other use of force incidents that took place in the GRVC before October 30, 2012, in which the inmate suffered serious injury and alleged that staff members had assaulted him.

70. As a result of the October 30, 2012 attack, Mr. Genao suffered serious physical and emotional injuries. He has repeatedly sought treatment for these injuries, and continues to suffer from severe back pain, headaches, emotional trauma, and other debilitating and persistent health issues.

## **FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983/Fourteenth Amendment**
**(Against the Individual Defendants and Supervisory Defendants)**

71. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

72. By assaulting and battering Plaintiff, and by maliciously and sadistically using gratuitous, excessive, brutal, and unconscionable force, and/or failing to prevent others from doing so, the Individual Defendants deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, the right guaranteed by the Fourteenth Amendment to the United States Constitution to be free from gratuitous and excessive force.

73. The Supervisory Defendants knew that the pattern of physical abuse described above existed in the City's jails prior to and including the time of the assault on Plaintiff.  Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to and acquiescence in the known unlawful behavior of their subordinates.  The prevalence of these practices and general knowledge of their existence at the time of Plaintiff's beating, and the failure of these Defendants to take remedial action despite the fact that the misuse of force in City jails had been persistently brought to their attention, constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Plaintiff.  These Defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.

74. The Individual and Supervisory Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their

employments as DOC officers and employees. Said acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. The Individual and Supervisory Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 and the United States Constitution.

75. As a direct and proximate result of the Defendants' misconduct detailed above, Plaintiff sustained the damages hereinbefore alleged.

### SECOND CLAIM FOR RELIEF

**42 U.S.C. § 1983/Fourteenth Amendment**
**(Against Defendant City)**

76. Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

77. Defendant City, through DOC and through its agents, employees, and representatives, acting under the pretense and color of law, permitted, tolerated, and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff prior to and at the time of Plaintiff's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice, or custom, and it caused the assault of Plaintiff.

78. By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom pursuant to which Plaintiff was subjected to a brutal beating, Defendant City has deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to,

the right guaranteed by the Fourteenth Amendment to be free from gratuitous and excessive force.

79.     As a direct and proximate result of the policy, practice, and custom detailed above, Plaintiff sustained the damages alleged herein.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief jointly and severally against Defendants:

1.  Compensatory damages in an amount to be determined at trial for the physical and psychological injuries sustained by Mr. Genao as a result of the events alleged herein.

2.  Punitive damages in an amount to be determined at trial.

3.  An order awarding Plaintiff reasonable attorneys' fees and the costs of this action.

4.  Such other further relief as the Court may deem appropriate.

Dated: October 8, 2014
       New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

Jonathan S. Abady
David A. Lebowitz
600 Fifth Ave., 10th Floor
New York, New York 10020
(212) 763-5000

THE LEGAL AID SOCIETY
Jonathan S. Chasan
Mary Lynne Werlwas
199 Water Street, 6th Floor
New York, New York 10038
(212) 577-3530

*Counsel for Plaintiff Gabino Genao*

19